UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SUDO PROPERTIES, INC.                                    CIVIL ACTION
AND HOUMA SPORTS
ENTERTAINMENT, LLC

VERSUS                                                   NO. 04-2559

TERREBONNE PARISH                                        SECTION "C" (1)
CONSOLIDATED GOVERNMENT

## ORDER AND REASONS

Before the Court are two motions: a Renewed and Supplemental Motion for Partial Summary Judgment, (Rec. Doc. 163), and a Renewed Motion in Limine to Limit and Plaintiff's Damages and to Exclude Plaintiff's Expert (Rec. Doc. 164), both filed by the defendant, Terrebone Parish Consolidated Government ("TPCG"). Having considered the motions, the memoranda and arguments of counsel, applicable law and the record, the TPCG's Renewed Motions for Partial Summary Judgment is granted in part, and denied in part; the Renewed Motion in Limine is granted in part, and denied in part.
.

## I. BACKGROUND

In November 2001, Linda McCarthy ("McCarthy")[1] approached Plaintiff, Sudo

---

[1] Director of the Houma Terrebonne Civic Center

Properties Inc. ("Sudo"), with a proposal to invest in an arena football team called the Bayou Bucks. Sudo accepted the proposal along with two other investors, the Houma Terrebonne Civic Center Development Corporation ("HTCC") and the President of the National Indoor Football League, Carolyn Schiver ("Schiver").[2] Each investor purchased a one-third share of the newly created Houma Sports Entertainment, LLC ("HSE"), the parent company of the Bayou Bucks.[3] McCarthy, through her position at the HTCC, secured a three year lease deal between HTCC and HSE for the Bayou Bucks to use the civic center.

In 2002, HTCC sold its share of HSE to Sudo and later that year Schiver forfeited her share of HSE when she failed to make required capital contributions.[4] Thus, by mid-2002, HTCC had become the sole owner of the Bayou Bucks. After managing the team's finances for one year, Sudo realized that the team was losing hundreds of thousands of dollars. The losses were not reflected in the projections and statements made by McCarthy during the initial investment and during the subsequent buyout of HTCC's share in HSE, all of which asserted a profit. Subsequently, Sudo submitted a public records request for tapes of HTCC's meetings,[5] and after reviewing these tapes, concluded that Terrebonne Parish Consolidated Government ("TPCG") perpetrated fraud with respect to the transactions described above.

Plaintiffs filed this action against TPCG on September 10, 2004, asserting claims under

---

[2] Rec. Doc. 163, p. 3.

[3] Rec. Doc. 123, Ex. C. HSE is also a plaintiff in this action.

[4] Rec. Doc. 123, Ex. E; Rec. Doc. 123 at 4.

[5] Rec. Doc. 123, Ex. D, J.

federal and state securities laws for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Louisiana Unfair Trade Practice and Consumer Protection Act ("LUTPA"), the Louisiana Blue Skies Act, and additional state claims for negligence, fraud and breach of contract.[6] On July 6, 2005, the Court granted TPCG's Motion for Summary Judgment as to the RICO claim.[7] Additionally, on March 6, 2006, the Court granted TPCG's Motion for Summary Judgment on the basis of prescription, which Sudo appealed to the Fifth Circuit.[8] The Fifth Circuit reversed and remanded the case on October 3, 2007, finding that prescription did not bar Sudo's claims.[9]

## II. LAW & ANALYSIS

### A. Summary Judgment Motion

#### 1. Summary Judgment Standard

Summary judgement is only proper when the record indicates that there is no "genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56. A genuine issue is one on which a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001). When

---

[6] Rec. Doc. 1. (With the exception of the breach of contract claim asserted by Houma Sports Entertainment, LLC, all other claims were brought by Sudo Properties, Inc.)

[7] Rec. Doc. 71.

[8] Rec. Doc. 134.

[9] Rec. Doc. 156.

considering a motion for summary judgment, this Court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577-578 (5th Cir. 1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, however, "the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). In order to satisfy its burden, the non-moving party must put forth competent evidence and cannot rely on "unsubstantiated assertions" and "conclusory allegations." *See, e.g., Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884-85 (1990); *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649-51 (5th Cir. 1992).

**2. Securities Claims**

TPCG's Renewed Motion for Partial Summary Judgment initially seeks dismissal of Sudo's securities claims brought under federal law.[10] TPCG avers that federal securities law does not apply to this matter because the "limited liability company membership interests at issue here are not 'securities' within the meaning of the securities laws." (Rec. Doc. 163, p. 6). According to TPCG, Sudo's membership interest in HSE did not qualify as an investment

---

[10] Rec. Doc. 163, p. 1.

contract because Sudo, rather than being a passive investor, exercised significant control over the investment and, therefore, the membership interest cannot be considered a security. *Id.* at 8.

In contrast, Sudo contends that its limited liability company ownership interests constitute "securities" because Sudo had little control over the investment. Sudo asserts that McCarthy ran HSE and exercised significant control over its operation. (Rec. Doc. 174, p. 10). Additionally, Sudo asserts that both parties signed documents indicating significant control, but that "the only person [known to be] running the team was Linda McCarthy." (Rec. Doc. 123, Ex. J, p.77-82).

The term "security" has been broadly defined in both relevant federal statutes to include, among other things, "any note, stock, treasury stock, security future [or] bond." 15 U.S.C. § 77b; 15 U.S.C. § 78c. Moreover, the Supreme Court has held that "the definitions of 'security' in [both Acts] are virtually identical and will be treated as such" in determining the scope of the term. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 n. 1 (1985). Pertinent to the instant case is the inclusion of "investment contract" in these definitions. 15 U.S.C. § 77b; 15 U.S.C. § 78c. In *S.E.C. v. W.J. Howey, Co.*, 328 U.S. 293, 298-99 (1946), the Supreme Court defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." Here, the parties appear to agree that HSE was a common enterprise with the expectation of profits; however, they disagree as to whether Sudo expected profits "solely from the efforts" of McCarthy and the level of control that Sudo in fact exercised.

The Supreme Court, since *Howey*, has relaxed the standard requiring that the investor

5

rely "solely" on the efforts of others. Subsequent Supreme Court decisions have omitted the word "solely" when restating the *Howey* standard. *See e.g., Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 561 (1979) (quoting *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975) ("the 'touchstone' of the *Howey* test 'is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'")). The Fifth Circuit has noted that, when determining whether an investor was unable to exercise meaningful control over the investment, Courts should look to the investment agreement itself or to the factual circumstances surrounding it. *Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir. 1981). The Fifth Circuit stated in *Williamson* that "[a]dherence to ['solely'] could result in a mechanical, unduly restrictive view of . . . an investment contract . . . thus the fact that [investors] were required to exert some efforts if a return were to be achieved should not automatically preclude a finding that (the scheme) is an investment contract." *Id.* at 418. Nevertheless, "[i]nsofar as the power retained by the investors is a real one which they are in fact capable of exercising, courts have uniformly refused to find securities in such cases." *Id.* at 419. Yet, the "proper inquiry now is whether 'the efforts made by those other than the investor are the undeniably significant ones . . . which affect the failure or success of the enterprise.'" *Youmans v. Simon*, 791 F.2d 341, 345 (5th Cir. 1986) (quoting *Williamson*, 645 F.2d at 418).

Additionally, the Fifth Circuit has identified three criteria that can be used to determine whether a general partner or joint venturer's interest is an investment contract security.[11] The

---

[11] While general partnerships and joint ventures are organized differently as compared to limited liability corporations, they are all considered under the blanket term "investment contract."

Court may look to whether:

>  (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership or venture powers; or
> (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or
> (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Williamson*, 645 F.2d at 424.

TPCG argues that Sudo was not a passive investor in HSE because Sudo's principal, Neil Suard ("Suard"), participated in negotiations for the purchase of the indoor football team franchise.[12] Defendant cites to Suard's deposition in support of this contention; however, the deposition does not support that Suard participated in the negotiations. Rather, the deposition shows that Suard discussed with McCarthy the amount of money needed to buy the equipment that the team required.[13] Further, the testimony suggests the significant role that McCarthy, not Suard or Sudo, played in the actual negotiations for the equipment. Based on a thorough review of the transcript, McCarthy knew the actual details about the management and purchase of the team and was merely relaying the information to Suard.[14] Accordingly, the deposition does not support the Defendant's assertion that Suard or Sudo exercised managerial control.

Next, TPCG notes that the "operating agreement itself stated that Suard would be a

---

[12] Rec. Doc. 163-3, p. 9.

[13] Rec. Doc. 163-5, Ex. "P," p. 4-6.

[14] *Id.*

7

manager and would direct, manage and control the Bucks business with the other two managers."[15]  TPCG also suggests that Suard's acts of signing contracts and checks should indicate that Sudo, through Suard, exercised significant control over HSE.  Defendant avers that Sudo's maintenance of financial control over its investment in HSE shows that this is not a security.  TPCG's final argument is that Sudo did not purchase a security because Sudo was a founding member of HSE.[16]

The operating agreement, however, does not define or delegate managerial tasks to any party in the agreement.[17]   Additionally, the term 'manager' is a word of art used in the agreement to define the parties to the agreement, rather than to somehow imply that they undertake or are assigned any specific managerial duties.  In fact, the contracts were signed by all of the members of HSE.  The record shows that Suard signed checks, but this only demonstrates that he was investing money in HSE.  Suard's actions do not sufficiently demonstrate "significant managerial control."   Stated another way, Sudo's choice to invest HSE does not demonstrate that it automatically attained managerial duties or the right to control the invested funds.  Furthermore, Defendant's argument that Sudo did not purchase a security because he was a founding investor is not convincing.  The fact that Sudo was one of the three initial investors in HSE is not dispositive to the inquiry as to whether that investment was a "security."

---

[15] Rec. Doc. 163-3, p. 9.

[16] Rec. Doc. 163-3, p. 11.

[17] Rec. Doc. 91, Ex. "B" (recognizing general management rights for "the management of all affairs of this organization" for all three parties listed in the operating agreement as "managers").

> In *United Housing* the Supreme Court stated that:
>
> The touchstone [of the determination] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or mangerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds . . . [i]n such cases the investor is 'attracted solely by the prospects of a return' on his investment.

421 U.S. at 852. The Supreme Court contrasted this scenario to an investment where the purchaser was motivated by a desire "to use or consume the item purchased." *Id.* Here, Sudo has presented evidence that it was attracted to the investment by the opportunity to make money, not by some desire to use the team or the civic center itself.

The Court must determine whether Sudo's actions were undeniably significant managerial efforts that affected the failure or success of HSE. *Youmans* 791 F.2d at 34. Sudo argues that McCarthy told Sudo that she had put everything in place and that she would run the team.[18] Moreover, McCarthy, as the director of the HTCC, set up the lease agreement between the HTCC and HSE. Additionally, McCarthy hired the general manager and coaches, dealt with problems that arose, and secured advertising in various outlets.[19] Paul Labat, the president of HTCC, testified that he understood McCarthy to be running the team and that McCarthy had negotiated the lease between HSE and HTCC.[20] Thus, the Court finds evidence that the third part of the *Williamson* factors may be satisfied. There is sufficient evidence to indicate that McCarthy, in her position as director of HTCC, was depended upon because of her unique

---

[18] Rec. Doc. 174. p. 9.

[19] *Id.* at 10.

[20] *Id.* at 11.

managerial ability. Indeed, the evidence indicates that McCarthy was the driving force behind HSE's creation. McCarthy's actions, when compared to Suard's, demonstrates a factual dispute regarding the level of control exercised by Sudo. Because there is a genuine issue of material fact regarding McCarthy's role in the management of this enterprise, a genuine issue of material fact also arises regarding the investment contract's "security" status. Consequently, TPCG has not met its burden and summary judgement for these claims is inappropriate.

While summary judgment is being denied, the Court notes the issue is close and that at trial Suard must meet the "difficult burden" of establishing that even though he was a partner, this was nonetheless, an investment contract. *Williamson*, 645 F.2d at 424.

### 3. LUTPA Claims

TPCG contends that Sudo may not bring claims under LUTPA because Sudo was neither a consumer, nor business competitor with TPCG as required by and defined in the act. *Id.* at 12. TPCG maintains that the parties were business partners, not competitors. *Id.* at 14. Furthermore, TPCG claims that under the Fifth Circuit's interpretation of LUTPA, 'consumer' shall only apply to transactions intended for personal, family or household use. *Id.* at 15. TPCG concludes that any relationship between Sudo and TPCG was purely business related, and thus, the terms of LUTPA do not apply. In opposition, Sudo argues that the definition of consumer under LUTPA should be viewed in a broader context in line with the Louisiana First Circuit's holdings in LUTPA cases. Specifically, Louisiana intermediate appellate courts have applied the statute to situations involving business consumers. (Rec. Doc. 174, p. 14).

TPCG correctly notes that pursuant to *Turbos de Acero de Mexico, SA v. American International Investment Corp., Inc.*, 292 F.3d 471 (5th Cir. 2002), LUTPA only affords a

private right of action to direct consumers or business competitors.  Additionally, under *Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.*, 922 F.2d 220 (5th Cir. 1991), the definition of consumer was limited to only those transactions including personal, family, or household use.  These holdings preclude business related claims under the statute.  *Id.* at 225-226.

This Court has consistently held that Fifth Circuit precedent controls the interpretation of LUTPA.  Consequently, this Court is prevented from entertaining LUTPA claims by plaintiffs who are not consumers or business competitors under the statute.  Plaintiffs offer decisions from the Louisiana First Circuit in support of the application of LUTPA to business related claims.  Regardless of whether "reconsideration of the Fifth Circuit's position regarding LUTPA may be appropriate," the Fifth Circuit, not this Court, must be the one to reconsider.  *5-Star Premium Finance, Inc.*, *v. Wood*, 2000 WL 1532896, *1 (E.D.La Oct. 16, 2000)  (Berrigan, J.); *See also Higbee Co., v. Greater Lakeside Corp.*, 2007 WL 3275142 at *2 (E.D.La Nov. 5, 2007) (Berrigan, J.)  (discussing the exclusion of business claims under the consumer arm of LUTPA); *Hamilton v. Business Partners, Inc.*, 938 F.Supp. 370, 371-74 (E.D.La 1996)  (Berrigan, J.) (recognizing *Wang's* restriction on business consumer claims under LUTPA).  This Court  finds that the claims in this matter are entirely business related.  Therefore, Plaintiffs' claims arising under LUTPA do not survive summary judgment.

**B. Motion in Limine**

    **1. Limited Damages**

TPCG argues that lost profits and "benefit-of-the-bargain" damages are not recoverable

under the facts of this case. Specifically, TPCG notes that the traditional measure of damages in a securities fraud case is the plaintiff's out-of-pocket loss, "measured by the difference between the real value of the securities at issue and the amount paid by the plaintiffs at the time of purchase." Rec. Doc. 164, p. 4 (quoting *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1136 (5th Cir. 1987)). TPCG relies on *Pelletier v. Stuart-James Co., Inc.*, 863 F.2d 1550 (11th Cir. 1989) for the proposition that "the measure of damages in a Rule 10b-5 case is limited to actual pecuniary loss suffered by the defrauded party, and does not include any speculative loss of profits." *Pelletier*, 863 F.2d at 1557-58. TPCG concludes that the Plaintiff's claim for damages must be limited.

In contrast, Sudo opposes TPCG's characterization of the law, arguing that benefit of the bargain recovery is allowed when out-of-pocket damages do not afford full recovery. Interestingly, Sudo also relies on *Pelletier*, noting benefit of the bargain recovery is allowed in security cases as an exception to the general rule. Sudo maintains that benefit of the bargain damages are recoverable in this case because 1) they are susceptible to being measured with reasonable certainty, and 2) traceable to TPCG's fraud.

Generally, "[t]he measure of damages in a Rule 10b-5 case is limited to actual pecuniary loss suffered by the defrauded party, and does not include any speculative loss of profits." *Pelletier*, F.2d at 1557-58. Furthermore, "plaintiff has the burden of proving every element of his Rule 10b-5 anti-fraud action, including damages." *Id.* at 1558. Yet, "a court may award 'benefit of the bargain' damages under Rule 10b-5 when the circumstances require it."[21] *Id.*

---

[21] Indeed, the Tenth Circuit has held that the "customary measure of damages in Rule 10b-5 cases is the out-of-pocket loss . . . but cases also support the trial court's fashioning of a remedy to suit the particular case." *Hackbart v. Holmes*, 675 F.2d 1114, 1121 (10th Cir. 1982),

*Pelletier* specifically states, "[i]n order to be entitled to 'benefit of the bargain' damages, however, there must in fact be a 'bargain' . . . an enforceable contract for the 'purchase or sale' of securities in order to support jurisdiction." *Id.* at 1559.

Sudo may recover the "benefit of the bargain" if it demonstrates 1) the damages can be measured with reasonable certainty, and 2) the damages are traceable to TPCG's fraud. *Panos v. Island Gem Enterprises, Ltd., N.V.*, 880 F.Supp. 169, 177 (S.D.N.Y. 1995). In addition, "cases that have allowed benefit-of-the-bargain recoveries have done so only when the loss is based on a strict contractual expectation, not expert speculation." *Island Gem Enterprises*, 880 F.Supp. at 181; *see also Pelletier*, 863 F.2d at 1559 (stating, "[i]n order to be entitled to 'benefit of the bargain' damages, however, there must in fact be a 'bargain' or contract."). Finally, the Second Circuit held that purchasers of a partnership interest cannot recover benefit-of-the-bargain damages under Rule 10b-5 when the claimed damages were speculative. *Commercial Union Assur. Co., v. Milken*, 17 F.3d 608, 614 (2nd Cir. 1994). The *Milken* court specifically found that "extrapolation" of the returns that the partnership could have earned were not reasonably certain to allow benefit-of-the-bargain recovery. *Id.*

The Court finds that Sudo is not entitled to the benefit-of-the-bargain recovery because Sudo has not demonstrated the contractual prerequisite for benefit-of-the-bargain recovery.[22] There is no evidence that the projected revenue was promised to Sudo; thus, the profit projections cannot constitute a "strict contractual expectation." Furthermore, Sudo's assertion

---

*rev'd on other grounds*, *Anixter v. Home-Stake Production Co.*, 939 F.2d 1420 (10th Cir. 1991).

[22] In addition, the Court notes that Sudo must first show that securities law applies to this matter before it is entitled to recover under Rule 10b-5's default measure of damages: out-of-pocket loss.

that McCarthy's profit projections can be measured with reasonable certainty is unconvincing because profit projections are similar to "extrapolations" of partnership returns. *Milken*, 17 F.3d at 614. Accordingly, TPCG has demonstrated the absence of genuine material fact regarding Sudo's potential recovery.

However, only two of Sudo's three categories of damage calculations are based on "the inaccuracy of projected revenue." Rec. Doc. 173, p. 10. Sudo's third category of damages measures the "net loss recorded by Houma Sports Entertainment." Therefore, the third category of damages is not precluded by the Court's finding that Sudo is not entitled benefit-of-the-bargain damages.

**2. Exclusion of Sudo's Expert**

TPCG's Renewed Motion in Limine seeks to exclude the testimony and report of Sudo's expert, Charles Theriot ("Theriot"), a Certified Public Accountant. TPCG argues that Theriot's calculation of damages is speculative and contrary to law. The damages theory Theriot provides is known as"benefit of the bargain" recovery. TPCG asserts that even if the benefit of the bargain analysis were allowed in this case, Theriot's calculation of the "total damages" is unscientific because his method consists of simple arithmetic. Sudo refutes TPCG's claim that Theriot's methods are speculative and unreliable. In addition, Sudo contends that Theriot's testimony will be useful to the factfinder in this matter.

Federal Rule 702 governs the admissibility of expert testimony and reports. It states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and

>   methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Rule 702 was amended in 2000 to reflect the United States Supreme Court decision in *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The *Daubert* decision changed the criteria for the admissibility of expert testimony, charging trial courts to act as "gate keepers" to ensure the proffered testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589. In *Kumho Tire,* the Supreme Court held that the relevant and reliable standard announced in *Daubert* for scientific expert testimony applied to all types of expert testimony. *Kumho Tire*, 526 U.S. at 147.

In *Daubert,* the Supreme Court created a two-prong test for trial judges to determine the admissibility of expert testimony. To admit expert testimony, a court "must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to: (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. Additionally, both prongs of the *Daubert* test must be satisfied before the proffered expert testimony may be admitted. *Id.* at 595. This analysis "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* Thus, the first prong of *Daubert* focuses on whether the expert testimony is based on a reliable methodology. In determining an expert's reliability, the court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. Several factors which may be considered in determining the soundness of the scientific methodology include: (1) whether the theory or technique can be and has been tested; (2) whether the theory

or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards; and (4) whether the theory or technique used has been generally accepted. *Id.* at 593-94. These factors do not constitute a definitive checklist or test. *Kumho Tire*, 526 U.S. at 144. Instead, they compose a nonexclusive, flexible test to ascertain the validity or reliability of the methodology the expert employed. *Id.* The applicability of each factor depends on the particular facts of the case. *Id.*

The second prong, whether the proposed testimony will assist the trier of fact to understand or determine a fact in issue, goes primarily to the issue of relevancy. *Daubert*, 509 U.S. at 591. *Daubert* described this examination as a question of whether expert testimony proffered in the case is sufficiently tied to the facts of the case so that it will aid the jury in resolving a factual dispute. *Id.* (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985).) As noted in *Cunningham v. Bienfang*, 2002 WL 31553976 (N.D. Tex. Nov. 15, 2002), Federal Rule of Evidence 401 defines "relevant evidence" as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Therefore, expert testimony is not relevant, and thus, inadmissable if it is not helpful. "Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier." *Peters v. Five Star Marine*, 898 F.2d 448, 450 (5th Cir. 1990). "The Court in *Peters* ruled that it is within the discretion of the trial judge to decide "that the [fact-finder] could adeptly assess the situation using only their common experience and knowledge," and thus exclude expert testimony on that basis. If the expert's testimony brings no more to the finder of fact than the lawyers can offer in argument, the expert's opinions should be excluded.

*In Re Midland Enterprises, Inc.*, 2002 WL 31780156 at *3 (E.D. La. Dec. 11, 2002).

It is important to note that when expert testimony or reports are challenged under *Daubert,* the Court's role as a gatekeeper does not replace either the traditional adversary system, or the jury's place within the system. *Scordill v. Louisville Ladder Group, L.L.C.*, 2003 WL 22427981 at *3 (E.D. La. Oct. 24, 2003). As the *Daubert* court noted, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. As a general rule, questions relating to the bases and sources of an expert's opinion, rather than its admissibility, should be left for the jury's consideration. *United States v. 14.38 Acres of Land, More or Less S. in County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (citing *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

The Court finds that Theriot is an expert in the filed of accounting. Theriot's education, employment history, publications, certifications, and experience testifying as an expert witness are sufficient evidence of his qualifications. (Rec. Doc. 124, Exhibit A, Appendices A & B). TPCG is correct that Theriot uses facially inexpert methods (i.e., simple addition and subtraction) to arrive at his damages total, it is Theriot's specialized knowledge of accounting procedures that will assist the fact-finder in this case.

Ultimately, the Court must determine whether Theriot's testimony will "assist the trier of fact to understand or determine a fact in issue." *Id.* at 592. This consideration essentially comprises the second prong of *Daubert*: whether the proposed testimony is relevant. *Daubert* establishes that this examination is a question of whether expert testimony is sufficiently tied to the facts of the case, such that it will aid the jury in resolving a factual dispute. Id. (citing United

17

States v. Downing, 753 F.2d 1224, 1242 (3rd Cir. 1985); see also Cunningham v. Bienfang, 2002 WL 31553976 (N.D. Tex. November 15, 2002) (noting Federal Rule of Evidence 401 defines "relevant evidence" as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence.").

Therefore, expert testimony is not relevant, and thus, inadmissable if it is not helpful. "Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier." *Peters v. Five Star Marine*, 898 F.2d 448, 450 (5th Cir. 1990). "The Court in *Peters* ruled that it is within the discretion of the trial judge to decide "that the [factfinder] could adeptly assess the situation using only their common experience and knowledge," and thus exclude expert testimony on that basis. If the expert's testimony brings no more to the finder of fact than the lawyers can offer in argument, the expert's opinions should be excluded. *In Re Midland Enterprises, Inc.*, 2002 WL 31780156 at *3 (E.D. La. Dec. 11, 2002).

The Court finds that Theriot's testimony will be helpful to the factfinder, especially in light of his experience in the areas of general accounting and lost-profits. The Court notes that Federal Rule of Evidence 702 speaks as much to "specialized knowledge" as it does to "scientific knowledge." In this case, Theriot's specialized knowledge, regardless of whether his calculations involve complex methodology, will assist the trier of fact in determining the extent of Sudo's claimed damages. Any issues regarding Theriot's expert report should be addressed through "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert* 509 U.S. at 596.

### III. CONCLUSION

IT IS ORDERED that Terrebone Parish Consolidated Government's Renewed Motion for Partial Summary Judgment is GRANTED IN PART, AND DENIED IN PART.  (Rec. Doc. 163). Sudo's claims pursuant to LUTPA are dismissed.

IT IS FURTHER ORDERED that Terrebone Parish Consolidated Government's Renewed Motion in Limine is GRANTED IN PART, AND DENIED IN PART.  (Rec. Doc. 164).  Sudo may not recover benefit-of-the-bargain damages; however, Sudo's expert shall not be excluded.

New Orleans, Louisiana, this 2nd day of July, 2008.

　　　　　　　　　　　　　　　　　　　HELEN G. BERRIGAN
　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE